# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIRNA L. SANTOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 17-321 (RMC) |
| | ) |
| WILLIAM P. BARR, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Virna L. Santos is an attorney who served at the Department of Justice, in California, in Bogotá, Colombia, and at Main Justice in Washington, D.C., until September 30, 2014. In this lawsuit, Ms. Santos alleges that she was retaliated against, harassed, and dismissed because she engaged in protected activity and not because there was a lack of funding for her position. The Department of Justice denies any discrimination. It states that Ms. Santos held positions which were limited-term appointments subject to funding and the Department reluctantly terminated her when funding for her most recent position could not be obtained. Based on legitimate nondiscriminatory reasons for its actions, the Department moves for summary judgment.

## I.    FACTS

Virna L. Santos left her position as an Assistant United States Attorney in the Eastern District of California in 2007, on a detail to the Department of Justice's (DOJ) Criminal Division, Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT), as a Resident Legal Advisor in Bogotá, Colombia. *See* Def.'s Statement of Undisputed Material

Facts (Def.'s SOF) [Dkt 19] ¶ 1.[1,2]  OPDAT is a section within DOJ's Criminal Division that

works to "develop and administer technical assistance designed to enhance the capabilities of

foreign justice sector institutions" so that they can work effectively with DOJ to combat

terrorism, human trafficking, organized crime, corruption and financial crimes.  Def.'s Mem. in

Supp. of Mot. for Summ. J. (Def.'s Mem.) [Dkt. 19] at 2 (citing U.S. DOJ, OPDAT,

https://www.justice.gov/criminal-opdat).  As of September 26, 2010, Ms. Santos transferred to

Main Justice in Washington, D.C. to serve as OPDAT's Regional Director for Latin America and

the Caribbean (LAC).  Ms. Santos' appointment had a "not-to-exceed" date of September 25,

2012, because it was a "two year term appointment."  Def.'s SOF ¶ 1.

Funding for OPDAT programs relies heavily on Interagency Agreements between

the Department of State and DOJ, although funds may come from other sources as well;

available monies can vary greatly from year to year.  *Id.* ¶ 2.  Ms. Santos says that she disputes

this fact, stating "[w]hile it is true that OPDAT relies on interagency funds, there was no

shortage of funds in 2014."  Pl.'s Statement of Genuine Issues in Supp. of Her Opp'n to Mot. for

Summ. J. (Pl.'s SOF) [Dkt. 22] at 2.  Her dispute merely adds an argument, citing to her own

declaration, but does not actually dispute Defendant's fact, which is therefore undisputed.

On March 13, 2011, Ms. Santos was appointed to a second time-limited

appointment, to expire on March 12, 2013.  It was described as "Dependant [sic] on Continued

---

[1] DOJ's Motion for Summary Judgment, Statement of Undisputed Facts, and Memorandum in Support are all included in electronic case filing (ECF) docket number 19.  Cites are to the page or paragraph number of the specific document, not the ECF page number.

[2] Ms. Santos says that she disputes many of Defendant's Facts, as noted here and below, but actually disputes very little, as also noted.  Ms. Santos's disputes mostly constitute argument about the significance of particular facts.  She does not challenge the validity of the facts asserted and relies on declarations of individual recollections and not contradictory documentary evidence on such matters as budgets and funding.

Availability of Funds." Def.'s SOF ¶ 3 (correction in original). Again, Ms. Santos says she disputes this fact, but only adds argument, again citing to her own declaration, that "[t]he 'not to exceed' dates were the subject of routine exceptions, and no OPDAT headquarters personnel or Regional Director other than Ms. Santos ever was refused the renewal of a term for financial reasons." Pl.'s SOF at 2. The fact that Ms. Santos's second appointment at Main Justice was also time-limited between 2011 and 2013 is therefore undisputed.

It is also undisputed that on July 11, 2012, Ms. Santos forwarded an email from Jeanette Mercado-Rios, a Resident Legal Advisor (RLA) in Mexico City, Mexico, to Carl Alexandre, OPDAT Director. The subject line of the email was "Disrespectful Working Environment." Def.'s SOF ¶ 4; Def.'s Ex. 6 [Dkt. 19-1] at 43-44.[3] It is further undisputed that on July 12, 2012, Ms. Santos sent an email summarizing a discussion she had had with Rene Holmes, another RLA in Mexico City, which Ms. Santos characterized as a report of a "hostile work environment." Def.'s SOF ¶ 4; Def.'s Ex. 7 [Dkt. 19-1] at 46. None of the emails in Defendant's Exhibits 6 or 7 states that gender discrimination was a factor in either woman's hostile work environment claims; in fact, Ms. Holmes complained of maltreatment by both her male supervisor and a female coworker. However, Ms. Santos adds that she herself "reported that gender discrimination was an issue with respect to all three Mexico Resident Legal [Advisors] who complained about [Senior RLA Kevin] Sundwall." Pl.'s SOF at 3. She cites her own declaration and that of Laurel Glenn, an Administrative Officer who "serv[ed] as a liaison between OPDAT management, *i.e.*, Mr. Alexandre and Ms. Ehrenstamm, and other OPDAT staff." Decl. of Laurel Glenn (Glenn Decl.) [Dkt. 20] ¶ 3. Ms. Santos reports that the RLA

---

[3] Cites to Defendant's exhibits are to the ECF header page number, not the original page number of the filed document.

complaints "were presented as gender discrimination issues" when she met with OPDAT Director Carl Alexandre and Deputy Director Faye Ehrenstamm.  Decl. of Verna Santos (Santos Decl.) [Dkt. 20] ¶ 4.  Ms. Glenn states that she was aware of the complaints referenced by Ms. Santos and declares that "[r]egardless of what was committed to writing regarding Ms. Mercado-Rios' complaint, it was considered to be and treated within OPDAT's main office as a complaint alleging, among other things, a gender-based hostile environment."  Glenn Decl. ¶ 6.  Deputy Director Ehrenstamm stated in an Affidavit by Interrogatory that she "ha[d] no recollection Ms. Santos expressing concerns that Kevin Sundwall sexually discriminated and/or harassed some of [Ms. Santos's] female subordinates" and that email communications with Ms. Santos discussed a possible hostile work environment, but contained "no mention of sexual discrimination."  Def.'s Ex. 2 [Dkt. 24-1] at 6.  It is, therefore, disputed whether gender discrimination was mentioned as part of any complaint of a hostile work environment.

On August 6, 2012, Renee Caputo, OPDAT's Director for Human Capital, sent an email to Tiffani Williams, an Employee Relations Specialist on her staff, directing Ms. Williams to talk to RLAs Mercado-Rios and Holmes regarding "treatment by their supervisor," Mr. Sundwall.  Def.'s SOF ¶ 5.  Ms. Santos insists that this fact is disputed but only adds that "Human Capital routinely investigates . . . whether there has been conduct that could violate Title VII" of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*  Pl.'s SOF at 3.

Numerous emails were exchanged among Mses. Santos, Mercadeo-Rios, and Holmes and the Human Capitol staff, and Mses. Mercadeo-Rios and Holmes were interviewed by that staff.  Def.'s SOF ¶ 6.  Defendants submit numerous emails and other documents as exhibits and none refers to gender as the basis for Mr. Sundwall's conduct.  Def.'s Ex. 9 [Dkt.

19-1] at 50-162 (various documents and email correspondence).[4]  While Ms. Santos again asserts

that this fact is disputed, she essentially admits the limitations of the emails—"[r]egardless of

what was committed to writing"—but argues that "the nature of the complaints" was well known

and gender discrimination issues "were discussed during meetings regarding these complaints

among OPDAT management, at least the ones attended by Virna Santos."  Pl.'s SOF at 4.  Thus,

despite the relative clarity of the written documents and email communications, most of which

do not allege gender discrimination, Ms. Santos repeatedly asserts that gender discrimination was

raised and discussed during meetings.[5]

      Ms. Caputo recommended that senior management talk with Mr. Sundwall about

the personnel issues in his office in Mexico City and, on August 29, 2012, Deputy Assistant

Attorney General (DAAG) Bruce Swartz and Counselor to the Assistant Attorney General Bruce

Ohr met with Mr. Sundwall and counseled him regarding the concerns of his subordinates.  *See*

Def.'s SOF ¶¶ 7-8; Pl.'s SOF at 4.

      Ms. Santos met with Director Alexandre and Deputy Director Ehrenstamm in

February 2013 for her mid-year performance review.  At that time, Director Alexandre told her

that "he intended to post a vacancy announcement for the Regional Director for LAC, but that

she would continue to have a role at OPDAT."  Def.'s SOF ¶ 9; *see also* Santos Decl. ¶ 10

---

[4] There are two documents in Exhibit 9 that could be deemed contrary.  In a January 25, 2013
email, Ms. Holmes described a conversation with Mr. Sundwall in which he referred to human
trafficking as "a case involving trafficking in chicks" or "chicas."  Def.'s Ex. 9 at 50.  A memo
from Ms. Mercado to Ms. Santos states that Mr. Sundwall asked Ms. Mercado for a hug and she
felt uncomfortable.  *Id*. at 129.

[5] The dispute over whether gender discrimination was raised in the complaints about Mr.
Sundwall need not be determined.  Whether Ms. Santos presented a *prima facie* case of
discrimination based on her protected activity concerning work conditions in Colombia is
irrelevant because the Court considers all of the evidence in evaluating Defendant's asserted
nondiscriminatory reasons.  *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494
(D.C. Cir. 2008).

(noting that her position "was going to be re-listed, and that [she] could reapply for [her] same position").

Director Alexandre left OPDAT in February 2013 and Ms. Ehrenstamm became Acting Director until she was selected to serve as the new Director in September 2013. Def.'s SOF ¶ 10. "Following Alexandre's departure, [Ms. Santos] remained in her position as Regional Director" for LAC. *Id.* Ms. Santos indicates that she disputes this fact but, more accurately, she adds allegations that her "working conditions changed dramatically at the end of 2012, after she reported the gender discrimination complaints." Pl.'s SOF at 5. In this regard, she complains that she was "only provisionally the Regional Director of LAC, and OPDAT was recruiting her replacement," *id.* at 6, and that she was "capriciously scrutinized, investigated, bypassed, and unfairly evaluated." *Id.*

Ms. Santos' term appointment as Regional Director for LAC, expired on March 12, 2013, but was extended for two three-month periods—until June 13, 2013, and then until September 30, 2013. Def.'s SOF ¶¶ 11-12. Ms. Santos' term was then further extended for one year, until September 30, 2014. *Id.* ¶ 16.[6]

On July 26, 2013, Ms. Santos reported to Christopher Lehmann, her first-line supervisor, and Acting Director Ehrenstamm that Paul Vaky, an OPDAT attorney assigned to Bogotá, had touched her lower back in a way she thought improper. Def.'s SOF ¶ 13 (Mr. Vaky "had placed his hand on her lower back during a courtroom proceeding when she leaned over to speak with him while he was seated."). Ms. Santos disputes only the description, saying that she "reported that the touching was inappropriate and of a sexual nature, and that Mr. Vaky's hand

---

[6] Defendant states the extension was "contingent on availability of funding," Def.'s SOF ¶ 16, which Ms. Santos does not dispute. Ms. Santos adds that "[n]o one had lost their position due to funding and there were funds available." Pl.'s SOF at 7.

was at the very lowest part of her back where she felt his fingers on her buttocks."  Pl.'s SOF at 6.

Acting Director Ehrenstamm and Director of Human Capital Caputo met with Ms. Santos almost immediately after her complaint, on July 31, 2013, to discuss the touching incident.  Def.'s SOF ⁋ 14; Pl.'s SOF at 6-7.  The Acting Director and Ms. Caputo also met with Mr. Vaky and counseled him on the incident during the week of August 19, 2013.  Def.'s SOF ⁋ 15; Pl.'s SOF at 7.

In early November 2013, Ms. Santos met with Director Ehrenstamm and Mr. Lehman to discuss her annual performance appraisal.  Def.'s SOF ¶ 17.  Afterwards, Ms. Santos sent an email to both of them objecting to the last portion of the appraisal concerning financial issues with OPDAT operations in Colombia, which she attributed to Mr. Vaky.  That portion of her appraisal was removed and is not in the final, signed appraisal.  *Id*.  Ms. Santos does not dispute these facts but adds that the appraisal was not changed for five months and that DAAG Swartz was provided a draft of the unrevised appraisal.  Pl.'s SOF at 8.

In December 2013, Ms. Santos was transferred from Regional Director for LAC to a newly-created position of Regional Director of Judicial Studies Institute (JSI).  Def.'s SOF ¶ 18.  Defendant explains:

> Prior to [this] assignment, JSI had fallen under the responsibility of [Ms. Santos] in her role as Regional Director for LAC.  The November 4, 2013, memorandum [which had] request[ed] approval of the reassignment indicated that costs for the position would be paid out of OPDAT overhead funds for the first year, but that future funding was anticipated from funds to be made available from the Department of State, Bureau of International Narcotics and Law Enforcement Affairs ("INL").

*Id*.; *see also* Def.'s Ex. 21, Nov. 4, 2013 Memorandum re Request for Reassignment of Virna L. Santos [Dkt. 19-3].[7]

Ms. Santos suffered no change to her grade, pay, or organizational status by the move from one Regional Director position to another. Def.'s SOF ¶ 20 (explaining "both were GS-15, step 10, Regional Director positions reporting to the Principal Deputy Director and Director of OPDAT").

The Interagency Agreement between the Department of State, Bureau of International Narcotics and Law Enforcement Affairs (INL), and DOJ (OPDAT) for the period March 31, 2014 to December 31, 2014 (a funding period that started after Ms. Santos's reassignment to Regional Director of JSI) contained no monies "*to pay for headquarters personnel* to support the JSI program." Def.'s SOF ¶ 21 (emphasis added). The March 31-December 31, 2014 Interagency Agreement expressly required OPDAT to "*use existing personnel* to plan, manage and facilitate the courses" and directed that "OPDAT may not use INL funds from this [Interagency Agreement] to hire new personnel." *Id* (emphasis added); *see also* Def.'s Ex. 26, Interagency Agreement (IAA) [Dkt. 19-3] at 63; Def.'s Ex. 34, Budget Breakdown for IAA [Dkt. 19-3] at 120. Ms. Santos asserts that she disputes this fact, the documentation notwithstanding, but actually argues that "OPDAT dragged its feet in getting a new budget" from INL for fiscal year 2014 and "[n]o one had lost their position due to funding and there were funds available." Pl.'s SOF at 9. Notably, Ms. Santos does not dispute the terms

---

[7] JSI was a high-profile program that was developed in collaboration with Supreme Court Justice Sonia Sotomayor to formalize judicial capacity building efforts in Latin America, and was one of OPDAT's most important programs. As Regional Director for [Latin America and the Caribbean], [Ms. Santos] was instrumental in designing and building the JSI program from its inception.

Def.'s SOF ¶ 19. Ms. Santos does not dispute the importance of JSI. *See* Pl.'s SOF at 8-9.

of the March 31-December 31, 2014 Interagency Agreement or its underlying Budget

Breakdown, which are therefore uncontested.

On June 9, 2014, Ms. Santos asked whether her appointment, scheduled to end on

September 30, 2014, the end of the federal Fiscal Year 2014, would be renewed.  *See* Def.'s SOF

¶ 22; Pl.'s SOF at 9.  Director Ehrenstamm told Ms. Santos by email on June 11, 2014, that "due

to the lack of 'any programmatic money' to support the JSI [leadership] position" as a Regional

Director after September 30, 2014, "her appointment would not be extended."  Def.'s SOF ¶ 23.

Ms. Santos disputes whether "there were funds available," Pl.'s SOF at 10, but does not dispute

what she was told by the OPDAT Director.

Ms. Santos adds that Director Ehrenstamm testified that the Director would have

liked to have had her continue as Regional Director of JSI if funding been available.  Pl.'s SOF

at 10; *see also* Pl.'s Ex. Q, Deposition of Faye Ehrenstamm (Ehrenstamm Dep.) [Dkt. 21] at 309

("Q: Did you want Ms. Santos to continue working at JSI after the end of her term in September

of 2014?  A: Had there been funding available, that would have been the most desirable

outcome."); *id*. at 313 ("If we had had the funding to support the regional director for JSI, yes,

we would have renewed the term, as consistent with what I told [Ms. Santos] when we first

executed the term agreement.").[8]  Director Ehrenstamm believed it was important to try to get

funding for Ms. Santos' position and her goal in the negotiations with INL was to obtain at least

partial funding for an OPDAT attorney to administer JSI.  *See id.* at 300 ("My goal was actually

to get funding for an attorney to administer JSI, either partial or whole funding."); *id*. at 301

("Mr. [James] Story [of INL] did not understand why we needed an experienced attorney to head

---

[8] Cites to Plaintiff's exhibits are to the ECF header page number, not the original page number of
the filed document.

up JSI, which I felt strongly we did."); *id*. ("My goal in all of this was to get funding to support an attorney to administer JSI.").[9]

Ms. Santos's appointment as Regional Director of JSI expired on September 30, 2014. Def.'s SOF ⁋ 24.

Between October 1, 2014 and March 2015, the Judicial Studies Institute continued to operate under an existing GS-15 manager, whose JSI duties were added to her position as Regional Director for Western Hemisphere programs. Pl.'s Ex. Q, Ehrenstamm Dep. at 299, 302. That position, and the positions for the rest of the JSI headquarters personnel, were partially funded by OPDAT using "overhead funds" from interagency funding. *Id*. at 304-05, 345; *see also* Santos Decl. ⁋ 19 (explaining that "unspent grant funds, or funds from the Department of Justice intended for many general aspects of OPDAT's operations, was often referred to as 'overhead' funding"). A new Interagency Agreement for JSI funding between INL and OPDAT was achieved in March 2015 but provided only fifty-percent (50%) of the needed funding for a JSI Program Manager at a GS-15 level. *See* Pl.'s Ex. Q, Ehrenstamm Dep. at 302 ("I believe it only provided for 50 percent for a program manager."); *id*. at 345 ("[W]e were using overhead to support a GS-15 level salary and the benefits that go with that. By having the Western Hemisphere team support that and not—because we couldn't afford to—replacing that position, obviously, the cost of that position on overhead was being essentially saved.").

## II.    PROCEDURAL HISTORY

Ms. Santos first contacted DOJ's Equal Employment Opportunity (EEO) staff on July 8, 2014, seeking counseling on her allegations of discrimination and retaliation. *See* Compl.

---

[9] Ms. Santos also notes that Ms. Ehrenstamm could not recall another instance in which a Regional Director's term appointment was not renewed. *See* Pl.'s Ex. Q, Ehrenstamm Dep. at 368 ("I do not recall a term for an RD [Regional Director] not being renewed.").

[Dkt. 1] at 7.  She filed a formal complaint on August 25, 2014.  *See id.*  DOJ issued a final

agency decision (FAD) on December 15, 2015, finding no discrimination or retaliation.  See

Def.'s Ex. 31 [Dkt. 19-3] at 85-110.  Ms. Santos appealed the FAD to the Equal Employment

Opportunity Commission (EEOC) on January 11, 2016, Def.'s Ex. 32 [Dkt. 19-3] at 112-14, and

filed suit on March 14, 2016 in the Eastern District of California before the EEOC had

completed its analysis.  *See Santos v. Lynch*, No. 16-351, Dkt. 1, Complaint (E.D. Cal. March 14,

2016); *see also* Def.'s Ex. 33 [Dkt. 19-3] at 116-18 (docket sheet for *Santos v. Lynch* in the

Eastern District of California).  The California case was transferred to the District Court for the

District of Columbia on Defendant's motion.  *See Santos v. Lynch*, No. 16-1039, Dkt. 15, Notice

of Transfer (D.D.C. June 2, 2016).  The case was dismissed without prejudice by a Judge of this

Court on July 20, 2016, based on Ms. Santos' failure to exhaust all administrative remedies.  *See*

*Santos v Lynch*, No. 16-1039, 2016 WL 3951060 (D.D.C. July 20, 2016).

 The immediate Complaint was filed on February 22, 2017.  *See* Compl.[10]

Defendant answered on July 11, 2017.  *See* Answer [Dkt. 10].  The parties completed discovery

on October 12, 2018, and Defendant filed his motion for summary judgment on November 2,

2018.[11]  The motion is ripe for review.

### III. JURISDICTION AND VENUE

 Courts "have an independent obligation to determine whether subject-matter

jurisdiction exists, even in the absence of a challenge from any party."  *Arbaugh v. Y & H Corp.*,

---

[10] Ms. Santos filed this action once 180 days had passed after the filing of her administrative
appeal of the agency's final decision to the EEOC.  Defendant does not argue that Ms. Santos's
Complaint is untimely and the Supreme Court has recently held that timeliness is an argument
that may be waived if not raised.  *See Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843 (2019).

[11] *See* Def.'s Mot. for Summ. J. (Mot.) [Dkt. 19]; Pl.'s Opp'n to Mot. for Summ. J. (Opp'n) [Dkt.
20]; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Reply) [Dkt. 23].

546 U.S. 500, 514 (2006).  Federal district courts have original jurisdiction to review

administrative decisions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et*

*seq*., pursuant to 28 U.S.C. § 1331 because Title VII cases are actions arising under federal law.

Venue is appropriate in this district under 28 U.S.C. § 1391(e) because the

Defendant—Attorney General William P. Barr, acting in his official capacity—resides in the

District of Columbia and Ms. Santos was at least in part employed by DOJ in the District of

Columbia.  28 U.S.C. § 1391(e)(1); *see also Smith v. Dalton*, 927 F. Supp. 1, 6 (D.D.C. 1996)

(allowing suit against a federal defendant under § 1391(e)(1) when "he performs a significant

amount of his official duties in this jurisdiction").  Defendant does not contest jurisdiction or

venue.

## IV.    LEGAL STANDARDS

### A.  Motion for Summary Judgment

Where no genuine issue of material fact exists, summary judgment is appropriate.

Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A genuine

issue of material fact is one that would change the outcome of the litigation.  *Id*. at 248.  In ruling

on a motion for summary judgment, a court must draw all justifiable inferences in the

nonmoving party's favor.  *Id*. at 255.  A nonmoving party, however, must establish more than

"the mere existence of a scintilla of evidence" in support of its position.  *Id*. at 252.  The

nonmoving party must point to specific facts showing that a genuine issue of material fact exists

for trial.  *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986).  The nonmoving party may not rely

solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable

jury to find in its favor.  *Id*. at 675.  If the evidence "is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations

omitted).  The court may treat any unaddressed factual statements in the defendant's motion as undisputed.  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

"While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  *Hussain v. Principi*, 344 F. Supp. 2d 86, 94 (D.D.C. 2004) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998)).

**B.  Title VII – Retaliation**

Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see also Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) ("Title VII prohibits the federal government from . . . retaliating against employees for engaging in activity protected by Title VII.").

To prove retaliation for protected EEO activities under Title VII, an employee must establish three elements:  that (1) she made a charge or opposed a practice made unlawful by Title VII; (2) the employer took a materially adverse action against her; and (3) the employer acted "because of" her protected conduct.  *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (stating that a retaliation

claim requires a plaintiff to "establish that [ ] she suffered (i) a materially adverse action (ii) because [ ] she had brought or threatened to bring a discrimination claim").  Retaliatory conduct need not reach the same level of adversity as discriminatory conduct.  *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010).  In other words, "Title VII's substantive [discrimination] provision and its anti-retaliation provision are not coterminous" because the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Steele v. Schafer*, 535 F.3d 689, 695-96 (D.C. Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

"Where a plaintiff attempts to prove unlawful retaliation in violation of Title VII using circumstantial evidence of motive, the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] ordinarily applies."  *Burton v. Donovan*, 210 F. Supp. 3d 203, 212 (D.D.C. 2016).  Under this framework, a plaintiff must first establish a *prima facie* case of retaliation, which then "trigger[s] the employer's burden to come forward with its actual legitimate, non-retaliatory reason for the challenged action."  *Allen*, 795 F.3d at 39.  If the employer comes forth with evidence of a legitimate, lawful reason for its action, the D.C. Circuit has instructed that the traditional *prima facie* analysis and burden-shifting framework of *McDonnell Douglas* fall away.  *Brady*, 520 F.3d at 494 ("Lest there be any lingering uncertainty, we state the rule clearly:  In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

The Circuit has recently clarified the test for determining if an employer has satisfied the second prong of asserting a legitimate, nondiscriminatory reason.  *See Figueroa v.*

14

*Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019). In *Figueroa*, the Circuit highlighted four factors a district court should consider when evaluating an alleged legitimate, nondiscriminatory reason for the employer's action. *Id*. at 1087-88.

> First, the employer must produce evidence that a factfinder may
> consider at trial (or a summary judgment proceeding). *See Segar* [*v.
> Smith*], 738 F.2d [1249,] 1268 [(D.C. Cir. 1984)] (noting that
> evidence must be "admissible"). Second, the factfinder, if it
> "believed" the evidence, must reasonably be able to find that "the
> employer's action was motivated by" a nondiscriminatory reason.
> *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir.
> 2004); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
> 133, 142 . . . (2000) (noting that the District Court may not engage
> in "credibility assessment" of witnesses who present evidence).
> That is, the employer must raise a genuine issue of fact as to whether
> the employer intentionally discriminated against the employee. . . .
> Third, the nondiscriminatory explanation must be legitimate. In
> other words, the reason must be facially credible in light of the
> proffered evidence. . . . [Fourth,] the evidence must present a clear
> and reasonably specific explanation. A plaintiff cannot be expected
> to disprove a defendant's reasons unless they have been articulated
> with some specificity.

*Id*. (some internal quotations and citations omitted).

"Where . . . 'an employer asserts a legitimate, nondiscriminatory reason for [a materially] adverse employment action,' the remaining question is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Minter v. Dist. of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015) (quoting *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). "At this juncture, plaintiff bears the burden of persuasion" and must "prov[e] that the [employer's] legitimate non-discriminatory reason is a pretext for [retaliation]." *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 161 (D.D.C. 2018).

## V.    ANALYSIS

Ms. Santos focuses her argument on whether she engaged in protected EEO activity, contending that "there is a genuine issue [of disputed material fact] pertaining to whether plaintiff presented complaints protected by Title VII" and whether her "superiors had knowledge of her complaints." Opp'n at 22-23. Because of this dispute, she contends that she is entitled to a jury trial.

However, as the non-moving party, Ms. Santos is already entitled to all justifiable inferences from the evidence on summary judgment, of which her protected activity would be one. *See Anderson,* 477 U.S. at 255. In light of this inference, Defendant assumes *arguendo* that Ms. Santos engaged in protected activity and that at least some of her superiors knew about it, even as it disputes those facts; nonetheless, Defendant argues that these facts are irrelevant to its legitimate, nondiscriminatory reasons for Ms. Santos's reassignment and separation. Reply at 4. Under the burden-shifting *McDonnell Douglas* framework, if the Court finds that the defendant offered a legitimate, nondiscriminatory reason for the challenged action, then the *prima facie* case falls away and the plaintiff must offer evidence to show pretext. *See Brady*, 520 F.3d at 494. The Court finds Defendant has offered legitimate, nondiscriminatory reasons for both challenged actions and that Ms. Santos has failed to raise any evidence, or even to argue, that those reasons are mere pretext to hide illegal conduct.

Under these circumstances, summary judgment will be granted to Defendant.

### A.  Reassignment to Regional Director of JSI

Ms. Santos was reassigned to the newly-created position of Regional Director of JSI in December 2013. Def.'s SOF ¶ 18. Defendant argues that this reassignment was due to Ms. Santos's excellent work with JSI and the fact that she was the best person for the position. *See* Def.'s Ex. 3, Deposition of Bruce Swartz [Dkt. 19-2] at 13 ("To be perfectly instrumental

about it, we also thought that by having someone who was so close to Justice Sotomayor as the Director of Judicial Studies Institute that that would strengthen our argument with State INL that we should be the administrating agency, not State Department."); Def.'s Ex. 21; Ehrenstamm November 4, 2013 Memo [Dkt. 19-3] at 3 ("Ms. Santos has been instrumental in designing and building the capacity of judges grappling with issues in legal systems transitioning from inquisitorial to accusatorial models. Through the JSI, Ms. Santos helped realize the vision Justice Sonia Sotomayor had when she requested OPDAT lead the effort to formalize judicial capacity building efforts in Latin America."); *id*. at 4 ("In short, Ms. Santos has developed the JSI concept from her position as LAC Regional Director, and she is the ideal candidate to take this initiative to the next level."). Ms. Santos had been responsible for the JSI program as the Regional Director for LAC but once a decision was made that the program required a full time Regional Director, she was transferred into that role. *See* Def.'s Ex. 3, Swartz Dep. at 13 ("The creation of the JSI position was to signal to the State Department that we considered this to be a critical program, that we were going to put the resources into it and have a senior person directing it in the hope that we could persuade them that we rather than the State Department should have the lead on the Judicial Studies Institute."). Ms. Santos does not dispute these facts or point to any evidence that could lead a factfinder to find that the proffered reasons are pretext. Instead, Ms. Santos recognizes that she was the most knowledgeable person about the position, *see* Def.'s Ex. 22, Deposition of Virna Santos [Dkt. 19-3] at 15 ("Q: But the question was do you think there was anyone that was better suited for the position of Regional Director at JSI than you? A: No. I don't think that anybody knew as much as I did about that position.").[12]

---

[12] Ms. Santos argues, but does not demonstrate, that the reassignment to Regional Director of JSI was a demotion. *See* Pl.'s SOF at 9. Ms. Santos believes her new position was a demotion

Defendant's proffered reason for reassigning Ms. Santos to Regional Director of JSI satisfies the *Figueroa* criteria. In fact, both parties point out the direct testimony and contemporaneous documentation of the reasons for the establishment of the new position, the selection of Ms. Santos for it, and the interagency squabble over its funding. Such evidence is not challenged and would be admissible at trial under *Figueroa* factor one. Second, there is no dispute between the parties that DOJ attempted, without success, to persuade INL that the leadership of JSI was sufficiently important for INL to help fund a new regional directorship at DOJ. This evidence supports Defendant's legitimate nondiscriminatory reason for the transfer under *Figueroa* factors two and three. Ms. Santos complains that OPDAT delayed in negotiating with INL for such funding but offers no facts to connect any such delay to herself rather than the interagency dispute over the position. It is also uncontested that Defendant chose to reassign Ms. Santos because she was the most qualified candidate for the position and not in retaliation for prior EEO activity. Finally, under *Figueroa* factor four, the reasons given by Defendant for the reassignment are specific enough for Ms. Santos to challenge but she agrees that she was the most qualified individual for the position. Therefore, the Court finds Defendant has raised a legitimate, nondiscriminatory reason for the reassignment. The burden now falls to Ms. Santos

---

because she had fewer staff to supervise and a smaller budget. However, the record shows without contradiction that the JSI position carried no lessening of title or salary; was important to OPDAT, which wanted the JSI headed by a DOJ Regional Director; and carried significant prestige from direct interaction with Supreme Court Justice Sonia Sotomayor, at which Ms. Santos had already excelled. *See Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) ("Purely speculative injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions."); *Brown v. Brady*, 199 F.3d 446, 457 (D.C. Cir. 1999), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) (finding no "actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.").

to provide evidence of pretext, but her opposition is devoid of any facts or argument to that effect.

The Court finds Ms. Santos's failure to raise any evidence of pretext, and her admission that she was the most qualified candidate for the new position, results in summary judgment in favor of Defendant on her claim of retaliation in the reassignment to the JSI position.

## B.  Failure to Renew Term as Regional Director of JSI

Ms. Santos also challenges her termination because her term as Regional Director of JSI was not renewed.  Ms. Santos does not dispute that both of her Regional Director positions with OPDAT were time-limited appointments.  *See* Def.'s SOF ¶¶ 1, 3, 11-12, 16, 18.  Her challenge rests on the contention that OPDAT has never before failed to extend a Regional Director's term appointment.  *See* Pl.'s SOF at 9.

The Regional Director of JSI position was created to demonstrate the importance of the program within OPDAT and was expressly "contingent on availability of funding."  Def.'s Ex. 18, Notification of Personnel Action [Dkt. 19-2] at 190.  Defendant argues that it intended for Ms. Santos to continue in the position and worked diligently to secure funding for her position after the expiration of its initial term.  *See* Pl.'s Ex. Q, Ehrenstamm Dep. at 309-10 ("Q: Did you want Ms. Santos to continue working at JSI after the end of her term in September of 2014?  A: Had there been funding available, that would have been the most desirable outcome."); *id.* at 313 ("If we had had the funding to support the regional director for JSI, yes, we would have renewed the term, as consistent with what I told [Ms. Santos] when we first executed the term agreement."); *id.* at 300 ("My goal was actually to get funding for an attorney to administer JSI, either partial or whole funding."); *id.* at 301 ("Mr. [James] Story [of INL] did not understand why we needed an experienced attorney to head up JSI, which I felt strongly we

did."); *id*. ("My goal in all of this was to get funding to support an attorney to administer JSI.").

Despite the efforts of Director Ehrenstamm and DAAG Swartz, funding from INL was not

secured and the Regional Director position was not extended. *See* Def.'s SOF ¶¶ 21, 23 ("[D]ue

to the lack of 'any programmatic money' to support the JSI [leadership] position" as a Regional

Director after September 30, 2014, Ms. Santos's appointment "would not be extended."); Def.'s

Ex. 26, Interagency Agreement (IAA) [Dkt. 19-3] at 63; Def.'s Ex. 34, Budget Breakdown for

IAA [Dkt. 19-3] at 120.

        Defendant has proffered a legitimate, nondiscriminatory reason for Ms. Santos's

termination: a lack of funding for her term appointment despite OPDAT's desire to continue to

lead the JSI program with a Regional Director within DOJ. As before, Ms. Santos therefore has

the obligation to come forward with evidence of pretext. Although Ms. Santos provides no

specific argument on this issue in her opposition, she does complain that there was a temporal

proximity between her prior protected activity and her termination and that OPDAT has not

before failed to renew a Regional Director position.

        "[W]hen an employer comes forward with a legitimate, nonretaliatory reason for

an employment action, positive evidence beyond mere proximity is required to create a genuine

issue of material fact concerning whether the motive for an adverse employment action was

retaliation." *Minter*, 809 F.3d at 71-72 (internal quotation marks omitted). Ms. Santos's

protected activity occurred in July-August 2012 and July-August 2013. *See* Def.'s SOF ¶¶ 4-8,

13-15. The decision not to renew her position happened in June 2014, at least ten months after

her protected activity. *See* Def.'s SOF ¶ 22; Pl.'s SOF at 9. Temporal proximity must be

significantly close in time to show causation or support a finding of pretext. *See Woodruff v.

Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) ("Temporal proximity can indeed support an

inference of causation, but only where the two events are very close in time." (internal marks and cites omitted)); *Akosile v. Armed Forces Ret. Home*, 141 F. Supp. 3d 75, 95-96 (D.D.C. 2015) (finding a seven to eleven-month gap between the protected activity and retaliation insufficient); *Greer v. Bd. of Trs. of the Univ. of the District of Columbia*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit."). The ten-month gap between her latest protected activity in August 2013 and OPDAT's notice that there were no funds to extend Ms. Santos's term in June 2014 does not support an inference of pretext.

Ms. Santos argues that OPDAT had never before failed to renew a Regional Director position. While Director Ehrenstamm could not recall another instance in which a Regional Director was terminated for lack of renewal funds, *see* Pl.'s Ex. Q, Ehrenstamm Dep. at 368 ("I do not recall a term for an RD [Regional Director] not being renewed."), none of that background appears to have matched the specific circumstances of the newly-established JSI position—created by OPDAT to establish DOJ control over the newly-independent JSI program in lieu of, but with significant funding from, State. If such a comparable situation ever existed, it is not revealed in the record or cited by Ms. Santos.

The Court will grant summary judgment to Defendant on Ms. Santos's claim of retaliation behind her termination because she failed to show that Defendant's legitimate nondiscriminatory reason for its action was a pretext to hide retaliation.

## VI.    CONCLUSION

For the reasons stated, summary judgment will be granted to Defendant. A memorializing Order accompanies this Memorandum Opinion.

Date: June 17, 2019

_____
ROSEMARY M. COLLYER
United States District Judge